# EXHIBIT E

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

| | |
|---|---|
| HYUNDAI MOTOR AMERICA CORPORATION, | )<br>)<br>) Case No. 9:20-cv-82102-WM |
| Plaintiff, | ) |
| v. | ) |
| EFN WEST PALM MOTOR SALES, LLC, | ) |
| Defendant/Counterclaim Plaintiff/Third-Party Plaintiff | ) |
| GENE KHAYTING; ERNESTO REVEULTA; EDWARD W. NAPLETON; GEOVANNY PELAYO; JORGE RUIZ, | ) |
| Defendants. | ) |
| EFN WEST PALM MOTOR SALES, LLC; for itself and in the name of the Department of Highway Safety and Motor Vehicles of the State of Florida, for its use and benefit, | ) |
| Counterclaim-Plaintiff/Third-Party Plaintiff | ) |
| v. | ) |
| HYUNDAI MOTOR AMERICA CORPORATION, | ) |
| Counterclaim-Defendant, | ) |
| AND | ) |
| HYUNDAI MOTOR COMPANY, | ) |
| Third-Party Defendant | ) |

**PLAINTIFF HYUNDAI MOTOR AMERICA CORPORATION'S STATEMENT OF MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [ECF 358]**

1

I) **Response to Defendants' Statement of "Undisputed" Material Facts:**

1) Undisputed

2) Disputed. It is undisputed that HMA is a California corporation with its headquarters in California and that HMA is registered to do business in Florida. It is also undisputed that HMA is a wholly owned subsidiary of HMC and that some of its subsidiaries other than HMA manufacture Hyundai and Genesis vehicles. However, the remainder of this assertion, concerning whether HMC conducts business in Florida, is denied, with reference to Fla. Stat. § 320.60 *et. seq*. ECF No. 318, HMA Answer, at ¶ 8 and ECF No. 215, HMC Answer, at ¶ 9.

3. Undisputed.
4. Undisputed.
5. Undisputed.
6. Undisputed.
7. Undisputed.
8. Undisputed.
9. Undisputed.
10. Undisputed.
11. Undisputed.
12. Disputed. The audit letter asked that the requested documentation be provided in four business days and further provided that HMA's audit team "will reach out to your team to help prepare for the Audit and clarify the data requests." ECF 358-2, 10/26/20 letter from Mary Bae.
13. Undisputed.
14. Disputed. In addition to references to the COVID-19 pandemic and the Audit's timing, EFN West Palm Motor Sales, LLC ("Dealer") demanded "an explanation as to what has triggered the Audits," without which it suggested it would view the Audit as "purely retaliatory in nature." Dealer claimed HMA was prohibited by law from conducting the Audit. ECF 358-3, 10/28/20 letter from Les Stracher.
15. Undisputed.
16. Undisputed.
17. Undisputed.

2

18. Undisputed but incomplete. HMA explained, with reference to Fla. Stat. 320.64(25), that consistent with law and practice, it would provide a written statement containing the basis upon which the dealer was selected for audit at the post-audit meeting. The letter also confirmed that, contrary to Dealer's unfounded assertions, the audit was not retaliatory. ECF 358-4, 11/6/20 Bertron letter.

19. Undisputed.

20. Undisputed.

21. Disputed insofar as this statement indicates that HMA committed "multiple violations under the Florida Dealer Act." However, HMA does not dispute that the referenced documents were filed on the referenced dates.

22. Disputed. Hyundai does not dispute that the referenced dollar figures provide a reasonable range of estimated damages, this range was based upon one method of viewing the relevant evidence. Hyundai intends to present additional methods of arriving at a reasonable estimate of damages based on relevant data. ECF 358-6, HMA's Supplemental Responses to Interrogatories 1 and 2 of Defendants' First Set of Interrogatories; *see also Jaguar Cars, Inc. v. Royal Oak Motor Car Co.*, 46 F.3d 258, 261 n. 2 (7th Cir. 1995); *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264-65, 579-80 (1946) (describing the "ancient principle" whereby a jury is permitted to "make a just and reasonable estimate of the damage based on relevant data" when the defendant's actions have "prevented a more precise computation").

23. Undisputed.

24. Disputed. This case arises out of fraudulent warranty and recall claims that Defendants' submitted. Hyundai's Theta II recalls, issued in 2015 and 2017, concern a condition created by manufacturing quality control issues whereby a subset of 2011-14 Hyundai Sonatas and 2013-14 Santa Fe Sports can develop bearing wear that can result in an engine seizure and, in some cases, a fire. Ex. 1, Recall Notice for Recall 15V-568; Ex. 2, Recall Notice for Recall 17V-226; Ex. 3, Smith Dep. 29:13-31:18. While these manufacturing issues do not affect all of the vehicles in this population, the recalls extend to all of the vehicles in this population because dealers need to inspect each vehicle to determine if it is experiencing the condition. *Id.* (Recall Notices). As of February of this year, approximately 33% of the vehicles in this population have experienced the issue. Ex. 4, Ex. D259 to Webster Knight Motors Dep. Defendants know that not all of the vehicles experience engine failure or fire because, although Dealer replaces Theta II engines at an

3

abnormally high rate relative to other Hyundai dealerships, its evaluations of customer vehicles routinely find vehicles that are not experiencing the issue. ECF 316-1, June 2022 Smith Report at 45-52. Defendants acknowledge this in Paragraph 37, where they discuss the recall test failure rate.

25. Disputed. As even the article Defendants cite explains, the Highway Loss Data Institute's was not specifically focused on Theta II engines or fires associated therewith. NHTSA's investigation of noncrash fires, with which the article is concerned, is likewise not limited to a study of issues associated with the Theta II engine. Ex. 5, NHTSA 2019 Petition Grant.

26. Undisputed that the Center for Auto Safety sent the referenced letter, but HMA disputes that quoted language concerned only the Theta II engine. The letter Defendants' cite itself makes clear that it was concerned with non-collision fires, whether or not they were related to the Theta II issue.

27. Disputed. CAS's request for a recall, and NHTSA's subsequent investigation, was not limited to issues associated with the Theta II engine. *Id*. Additionally, the referenced consent order with NHTSA was not related to NHTSA's fire investigation, as the consent order itself makes clear. ECF 353-1, Consent Order.

28. Undisputed.

29. Undisputed.

30. Undisputed.

31. Disputed. First, this is a legal assertion rather than a factual one. Second, the legal assertion is incorrect because statements made by an opposing party, such as Defendant Revuelta's statements to Mr. Minier, are not hearsay. Fed. R. Civ. P. 801(c)(2); *see also* Ex. 6, Minier/Eddleman Text Messages (D-0255415-16). Third, Mr. Eddleman testified that Defendant Napleton informed him of the warranty fraud. Exhibit 7, Eddleman Dep. 181:17-182:15. *See also id*. 9:20-10:3, 12:19-20; 17:18-24; 49:25-50:4, 55:24; 86:1-18; 181:6-13 (referencing various conversations with EW Napleton).

32. Disputed. In response to a text message that asked "[h]ow do gene [Khaytin] & Ernie [Revuelta] play this engine game[,]" Mr. Minier sent Mr. Eddleman a text message that read, "They are buying auction cars. And yes blowing up a lot. I had lunch with Ernie [Revuelta] yesterday he blew up 22 this month." Ex. 6, Minier/Eddleman Text Messages (D-0255416). Minier testified that these are his text messages, that he wrote these words, and that he believed them to be true at the time he wrote them. Ex. 8, Minier Dep at 129:14-130:2; 137:7-22. Minier

4

also testified that he and Mr. Revuelta regularly communicate and have lunch together. *Id.* 14:14-15:8. Minier now claims to remember that what his friend Ernie actually told him at lunch was not that he blew up 22 engines that month (as Minier wrote at the time), but that "he had 22 non-customer vehicles" that "needed engines." *Id*. 133:13-22. According to Minier, he purportedly now realizes he made an incorrect assumption in writing his text message to Eddleman, but he is unable to recall how or when he learned his text message was incorrect. *Id.* at 146:2-149:24

33. Disputed. Mr. Eddleman testified that Defendant Napleton informed him of the warranty fraud. Ex. 7, Eddleman Dep. 181:17-182:15, *see also id.* 9:20-10:3, 12:19-20; 17:18-24; 49:25-50:4, 55:24, 86:1-18, 181:6-13 (referencing various conversations with EW Napleton encouraging Eddleman to participate in fraud and describing fraud). These statements are not hearsay, they are admissions. Fed. R. Civ. P. 801(c)(2). Moreover, Eddleman repeatedly testified that he personally witnessed Khaytin buying the cars at auction every week and "knew what he was doing." Ex. 7, Eddleman Dep. 10:3-4, 12:8-10, 12:20-23. Eddleman also testified that he personally reviewed the used inventory reports for the Dealer, which reflected the additional "engine vehicles" purchased at the auctions, and he explained that EW Napleton would then have to sign off on these in order to allow the Dealer an exception from NAAS's 60 day used-car inventory policy as part of the fraud. *Id.* 12:23-13:3, 13:22-14:20, 181:17-182:15.

34. Disputed. In addition to hearing the car, Mr. Diaz testified that he saw Defendant Ruiz in the car while it was revving. Ex. 9, Diaz Dep. 78:4-80:3. Mr. Diaz also testified that vehicles make a different sound when revved without oil than they do when revved with oil and testified that not enough time had elapsed for Defendant Ruiz to have refilled the car's oil. *Id.* at 77:13-80:3.

35. Undisputed.

36. Disputed because this inaccurately summarizes Mr. Diaz's testimony. After testifying that he never observed anyone "shortcut the paperwork," Mr. Diaz responded to a leading question that suggested Dealer's service technicians were too lazy to take a photograph by answer, "Sure. But the problem with that is, is that it should be a picture of the oil pan from the vehicle, not a picture of an oil pan that's not on the vehicle." *Id.* at 86:18-87:5.

37. Disputed because Defendants cite to a deposition of a witness other than Mr. Smith that occurred more than year before Mr. Smith's June 2022, report and approximately nine months before Mr. Smith's report in the termination case that also included his warranty rate analysis.

5

Defendants references this testimony, which concerned an entirely different warranty rate analysis that was performed by someone other than Mr. Smith and that is not being offered in this case, in order to provide a basis for their Footnote 6, which attempts to confuse the Court about the relationship between Mr. Smith's analysis and this other analysis. In reality, there is no relationship. However, it is undisputed that Mr. Smith's June 2022 report included warranty rate analysis that found Dealer's rate of engine replacements was substantially higher than other dealers and further analysis that found Dealer's rate of claims involving alleged engine seizure was also substantially higher than other dealers. ECF 316-1, June 2022 Smith Report at 45-52.

38. Disputed. *See* response to paragraph 38.

39. Undisputed.

40. Disputed. Mr. Minier sent a text message saying that engines were being claimed but not replaced. Ex. 6, Minier/Eddleman Text Messages (D-0255416). Additionally, Mr. Eddleman testified that he was informed of this phase of the scheme through conversations with Defendant Edward W. Napleton and Napleton executive Jill Brotherton. Ex. 7, Eddleman Dep. 49:5-50:4; *see also* Ex. 10, Ex. 10 to NAAS Dep. (McAskill Text Message referencing Napleton's "official[] 'discover[y]' [of] what was going on with those claims" (D-00269966)); Ex. 11, Ex. 12 to NAAS Dep. (Korth Email discussing "warranty engine debacle" (D-00280066)).

41. Undisputed.

42. Undisputed.

43. Undisputed.

44. Undisputed.

45. Undisputed.

46. Disputed. Mr. Napleton is an executive of North American Automotive Services, Inc. ("NAAS" or "NAG"), and performs services on its behalf. *See* Defs.' SOF [ECF 358] ¶ 45. He served as the director of southeast operations for NAAS from 2015 until June 2018, when his role expanded to encompass dealerships throughout the entire country. ECF 258-14, E.W. Napleton Dep. 32:10-25. He is compensated by NAAS. *Id.* 55:17-20. He provides certain support and supervision with respect to "sales, parts, service, employee satisfaction, [and] customer satisfaction" to NAAS's various dealerships. Ex. 12, E.W. Napleton Dep. 33:1-5. Undisputed that NAAS provides the specified consulting services.

6

47. Undisputed. However, in addition to Balanced Days Supply, HMA has also used sales share, also known as a "turn and earn" formulaic allocation of new vehicles. Ex. 13, Frattiani Dep. 18:10-14; Ex. 14, Kim Dep. 59:10-11.

48. Undisputed. However, the Balanced Day algorithm seeks to equalize, model by model, the "days supply" of inventory available to dealers in a given geographic region and seeks to ensure that for each model, days supply for each dealer in the region is equal to days' supply for the region as a whole, to the extent possible. Ex. 15, Plaintiff.HMA.Napleton.00048445-50.

49. Disputed. HMA has used at different times in the past either a Balanced Days Supply and/or a Turn and Earn formulaic allocation algorithm. Ex. 14, Kim Dep. 59:3-23.

50. Undisputed. Discretionary allocation would never exceed 15% of the Region's total allocation. Ex. 16, Turbyfield Dep. 15:4-12.

51. Undisputed.

52. Undisputed.

53. Undisputed.

54. Undisputed.

55. Undisputed.

56. Disputed as stated. One factor HMA sometimes considered in whether to supply discretionary allocation was a dealer's Balanced Day Supply. Kim Dep. 40:4-15; Turbyfield Dep. 14:9-15:3. Additionally, HMA used multiple factors to determine whether to provide a dealer with discretionary allocation including overall market support, participation in certain Hyundai facility programs, and a dealer's involvement in litigation. Ex. 14, Kim Dep. 30:17-25, 31:1-22, 34:5-8; Ex. 16, Turbyfield Dep. 16:24-17:17.

57. Disputed that Hyundai implemented a discretionary allocation policy. Instead, HMA determined discretionary allocation using multiple factors, also referred to as guidelines. Ex. 14, Kim Dep. 43:24-44:6.

58. Disputed as stated. The April 19, 2022 email from Mr. Grafton speaks for itself. Mr. Grafton was not involved in HMA's allocation of vehicles. Ex. 17, Grafton Dep. 108:13-109:11; Ex. 14, Kim Dep. 124:15-24.

59. Disputed. Mr. Grafton had no involvement in HMA's vehicle allocation. Ex. 17, Grafton 108:22-109:3. Instead, Hyundai's Regional Management team would determine how discretionary allocation would be distributed within a Region. Ex. 14, Kim Dep. 45:13-21; Ex. 16,

7

Turbyfield Dep. 18:17-24; 32:17-21. Participation in HMA's facility programs could be one of many factors considered in determining whether a dealer received discretionary allocation. Ex. 14, Kim Dep. 33:5-10; Ex. 16, Turbyfield Dep. 17:24-18-5.

60. Disputed. HMA used multiple factors or guidelines in making such a determination. Ex. 14, Kim Dep. 44:2-6. Further Mr. Grafton was not involved in HMA's allocation of vehicles. *Id.* 124:15-24; Ex. 17, Grafton Dep. 108:13-109:11.

61. Disputed. Mr. Grafton had no involvement in HMA's vehicle allocation. Ex. 17, Grafton Dep. 108:22-109:3. HMA's GDSI 2.0 facility program is voluntary. Ex. 14, Kim Dep. 32:18-24; Ex. 17, Grafton Dep. 35:1-36:9, 128 19-24; Ex. 18, Plaintiff.HMA.Napleton.00051221-51262.

62. Undisputed.

63. Disputed as stated. There is no evidence in the record that Dealer ever asked HMA why Dealer was not receiving any *discretionary* allocation or that HMA ever made any representation to Dealer why it was not receiving discretionary allocation.

64. Undisputed. HMA further states that the email speaks for itself as to Mr. Fratianni's explanation as to HMA's allocation of vehicles to Dealer. Further, Dealer's own expert admitted that he was not aware of any OEM that tells its dealers the specific basis upon which it makes "discretionary" allocation decisions. Ex. 19, Stockton Dep. 89:16-24.

65. Undisputed.

66. Undisputed. However, a Hyundai dealership in litigation could still receive discretionary allocation from HMA. Kim Dep. 113:25-114:10; 123:5-12. Whether a dealer was in litigation with HMA was one of many factors HMA considered in determining whether a dealer received discretionary allocation. Ex. 14, Kim Dep. 28:14-29:1; Ex. 16, Turbyfield Dep.31:3-12.

67. Undisputed. However, not participating in Hyundai programs and being involved in litigation with Hyundai are merely factors considered on a case-by-case basis assessment of whether a dealer would receive discretionary allocation. Ex. 14, Kim Dep. 29:14-30:9; 33:25-34:8.

68. Undisputed that Dealer contends it has received less allocation since November 2020. However, since the commencement of the case, Dealer has actually turned down hundreds of vehicles allocated to it. Ex. 20, Dealer Dep. (Oct 4, 2022) 103:12-22; Ex. 21, Tab 21 to Stockton Report; Ex. 19, Stockton Dep. 133:15-134:1, 136:15-18, 137:11-14, 139:16-25. Furthermore, the

8

formula used to allocate non-discretionary is applied equally across all dealers. Ex. 14, Kim Dep. 24:25-25:4.

69. Disputed. HMA provided Dealer with discretionary allocation in 2022. Ex. 14, Kim Dep. 46:21-47:19.

70. Undisputed.

71. Undisputed.

72. Disputed as stated. Mr. Fratianni testified that he would usually report Napleton's complaints to Tim Turbyfield or Bob Kim. Ex. 13, Fratianni Dep. 46:19-22.

73. Disputed as stated. Whether a dealer was in litigation with HMA was one of many factors HMA considered in determining whether a dealer received discretionary allocation. Ex. 14, Kim Dep. 28:14-29:1; Ex. 16, Turbyfield 31:3-12

74. Disputed. Dealer received discretionary allocation from HMA in September 2021. Exs. 22 and 23, Exhibits 3 and 11 to Asker Report.

75. Disputed as stated. During July, August, and September of 2021, Mr. Goetze was directed to withhold discretionary allocations to Dealer because of its involvement in litigation and non-participation in programs. Ex. 24, Goetze Dep.74:12-15. Dealer was provided with discretionary allocation in September 2021. Exs. 22 and 23, Exhibits 3 and Ex. 11 to Asker Report.

76. Undisputed. However, whether a dealer had 12 or fewer vehicles on its lot was not outcome determinative of whether a dealer received discretionary allocation. Instead, HMA's regional management considered multiple factors in determining discretionary allocation. Ex. 24, Goetze Dep. 96:18-22; Ex. 14, Kim Dep. 28:3-11; Ex. 16, Turbyfield Dep. 16:24-17:17.

77. Undisputed. *See* ¶ 76.

78. Disputed. Dealer's calculation of the total number of discretionary units includes non-discretionary units allocated. Ex. 25, Exhibit 1 to Asker Report.

79. Disputed. Dealer's calculation of the total number of discretionary units includes non-discretionary units allocated. *Id.*

80. Undisputed, and Mr. Fratianni promptly responded to the complaints. Ex. 13, Fratianni Dep. 84:1-85:25.

81. Disputed as stated. Napleton Dealer had 7 Santa Fes (combined pipeline and in stock inventory). Exs. 26 and 27, Exhibits 14 and 21 to Asker Report. Further, the data shows that on the respective days in November 2021, Dealer was ranked in the 49th and 37th percentile for

9

Santa Fes, and in the 79th and 89th percentile for Elantras, for days supply across the Southern Region. Ex. 28, Exhibit 12 to Asker Report. In addition, for these days in November 2021, Dealer was in the 53rd and 44th percentile for Santa Fes and the 79th and 89th percentile for Elantras, when considering pipeline. Ex. 26, Exhibit 14 to Asker Report.

82. Disputed as stated. The data from VAuto Conquest attached to Napleton's March 9, 2022, email represents up to date inventory on a specific day of March, it does not represent Dealer's inventory for the entirety of the month. Ex. 29, Mar. 9, 2022 email. Furthermore, low pipelines for Elantra were common among Southern Region dealers in March 2022. Ex. 26 and 28, Exhibits 14 and 12 to Asker Report.

83. Disputed. Mr. Fratianni testified that he did not know whether Brian Napleton's email was accurate as to Dealer's inventory on March 25, 2022. Ex. 13, Fratianni Dep. 146:4-23.

84. Disputed as stated. There are many factors as to whether a dealership will sell a vehicle and the mere fact that a vehicle is allocated to a dealership does not insure that dealership will ultimately sell that vehicle. Ex. 16, Turbyfield Dep. 19:15-21; Ex. 14, Kim Dep. 59:24-61:3.

## II. Additional Facts
### A) The Recall Conditions and Claims Process

85. Recalls were issued in 2015 and 2017 for 2011 for 2011-14 Hyundai Sonatas and 2013-14 Santa Fe Sports equipped with Theta II engines. Exs. 1 and 2, Recall Notices for Recalls 15V-568 and 17V-226; Comp. Ex. 30, Dealer Best Practice Guides; Ex. 31, *Mendoza* Settlement.

86. The recalls require dealers to perform diagnostic tests on vehicles pursuant to methods prescribed by HMA in order to identify affected vehicles. *Id.* Hyundai dealers are paid by HMA to replace the engines in the affected vehicles. *Id.*

87. As the recall condition progresses, the ongoing bearing wear causes an audible knocking sound that becomes more noticeable over time. ECF 316-1, Smith Report, at 1-3; Ex. 32, Lange Dep. 26:20-30:11. This knocking occurs for several hundred miles or more before ultimate engine seizure caused by the friction. ECF 316-1, Smith Report, at 1-3. *Id.*

88. Prior to replacing an engine under recall or warranty, dealers submit a claim through an online portal to HMA's Prior-Approval (PA) Department. *Id.*; DE 358 at ¶ 28. This payment is made by way of an online bank transfer. Exhibit 33, NAAS Dep. (May 18, 2021) 179:19-180:6.

89. For seized engine claims, HMA required dealers to submit photographs of the engine's oil pan because metallic debris would be visible if an engine seized due to the recall condition. Comp. Ex. 30, Dealer Best Practice Guides; Ex. 34, Ruiz Dep.18:11-19:8; Ex. 9, Diaz Dep. 21:22-22:22, 41:1-42:1, 73:18-82:1; Ex. 35, Pelayo Dep. 24:12-16; ECF 316-1 at 35-36.

**B)   The Scheme to Commit Fraud**

90. After the recalls were issued, Dealer began submitting fraudulent claims to HMA. Ex. 6, Text Messages; Ex. 7, Eddleman Dep., at 7:21-8:2, 51:24-52:21, 59:25-60:9, 158:4-160:8, 163:11-166:2, 172:9-179:4, 196:23-200:7, 206:10-215:25; Ex. 9, Diaz Dep., at 32:13-33:11, 35:14-36:7, 106:1-107:22, 130:6-131:25; 138:5-7. Prior to March 2017, at least some of these claims involved engines that were never actually replaced (referred to hereinafter as the "parts inventory scheme"). Ex. 6, Text Messages (D-0255416); Ex. 7, Eddleman Dep., at 22:18-25:12, 28:14-20, 158:4-160:8, 163:11-166:2, 172:9-179:4, 206:10-215:25. In these instances, the new engine provided by Hyundai was not installed into the vehicle that was the subject of the claim, but instead would be stored in Dealer's parts inventory. Ex. 7, Eddleman Dep. 22:18-25:12, 28:14-20; Ex. 6, Text Messages (D-0255416).

91. NAAS executives identified that in just six days $291,000 of engine replacement warranty work had purportedly been done by the Dealer. Ex. 36, Exhibit 6 to E.F. Napleton Dep. Ex. 6 at 1, 2-3. Khaytin and Revuelta were reprimanded by NAAS for "fraudulent" practices in connection with "replacement (re-call) engines." Comp. Ex. 37, Exs. 8 and 9 to NAAS Dep..

92. In March 2017, NAAS executives met with Defendants Khaytin and Revuelta about the parts inventory scheme. Ex. 6, Text Messages (D-0255415-16); Ex. 7, Eddleman Dep. 22:18-25:16, 27:22-29:3, 46:23-50:4, 158:4-166:2, 170:5-174:15; Ex. 10, McAskill text; Ex. 11, Korth email; Ex. 36, Exhibit 6 to E.F. Napleton Dep. After this meeting, Napleton told Khaytin and Revuelta that he needed to be kept informed of such fraud schemes so that he could protect them from getting caught. Ex. 7, Eddleman Dep. 22:18-23:23, 49:5-20, 158:4-160:8, 171:9-179:4. Napleton encouraged them to continue submitting fraudulent claims, but to do so more carefully to avoid getting caught. *Id.* Defendants then began "blowing" engines. They ran the engines without oil to induce an engine seizure that mimicked the recall condition, and then replaced them with new engines provided by Hyundai. *Id.* 44:2-49:20, 158:4-160:8, 176:4-187:10; Ex. 6, Text Messages (D-0255415-16), Ex. 9, Diaz Dep., at 28:5-31:24, 74:20-82:5; Ex. 7, Minier Dep. 129:14-130:2; 133:13-22; 137:7-22. For multiple different claims, Defendants submitted the same

11

photographs, sometimes in a different resolution or differently cropped, but depicting the same oil pan. Ex. 9, Diaz Dep. 32:13-33:1, 35:14-36:8, 84:4-85:14; ECF 316-126-35 & Appendices C-F.

93. Defendants' fraud is established by evidence that includes: (a) testimony from Mr. Eddleman and Mr. Diaz cited herein; (b) text messages cited herein; (c) 196 instances of the same photograph submitted with multiple claims (Smith Appendix D); (d) 200 instances of the same photograph but in a different resolution or differently cropped submitted in association with multiple claims (Smith Appendix E); (e) 42 instances of different photographs of the same oil pan submitted in association with multiple claims (Smith Appendix F); (f) a claim rate analysis that found that Dealer's rate of engine replacements on a monthly basis in a 72 month period was higher than the average rate of other dealers in 70 of those months (ECF 316-1, Smith Report at p. 45-47, Section 8.1); (f) a seizure rate analysis that found that Dealer's rate of engine replacements for claims involving alleged seizures on a monthly basis for a 19 month period was higher than the rate for other dealers in all 19 of those months and is the highest average ranking dealer with respect to monthly seizure rate (October 3, 2022 Smith Report); and (g) instances where vehicles inspected by Dealer were found to have engines in good working order that were then followed by claims for alleged seizure with little to no additional mileage added between the time of inspection and the claimed seizure (Smith Report Section 10). ECF 316-1, June 27, 2022 Smith Report; Exhibit 38, October 4, 2022 Smith Report.

**C) The Role of Each Defendant**

94. NAAS is majority-owned by two trusts, of which Edward W. Napleton is a beneficiary. *See* Ex. 39, West Palm Dealer Agreement at 19; Ex. 12, E.W. Napleton Dep. 23:11-18; Ex. 40, Dealer Dep. (May 20, 2021) 25:10-27:9.

95. Defendant Napleton's compensation is tied to the general profitability of Dealer because he is paid 3.75% of its net pre-LIFO profits. Ex. 12, E.W. Napleton Dep. 255:22-257:18; *see also* Ex. 48, Ex. 8 to Dealer Dep. (May 20, 2021) at D00255279 ("We need to talk about our detailed plan on Hyundai engines how to get more. . . . I will get with Ernie and Robb.").

96. During the relevant period, NAAS imposed a used car inventory policy upon its affiliated dealerships that limited the dealerships' used car inventories and required them to set a reserve for used vehicles that were in inventory over 60 days. Ex. 41, 2015 Used Car Policy.

12

97. In his authority as NAAS director, E.W. Napleton granted exceptions to Dealer in connection with the used car inventory policy. Exs. 42 and 43, Exhibits 3 and 4 to NAAS Dep.; Ex. 12, E.W. Napleton Dep. 114:16-117:13; Ex. 7, Eddleman Dep.13:22-14:20, 181:17-183:19.

98. E.W. Napleton granted these exceptions, despite disagreement by NAAS' CFO and despite the fact it sometimes resulted in "inventory issues at West Palm" and "a log jam of cars." Ex. 43, Ex. 4 to NAAS Dep; Ex 44, Ex. 7 to NAAS Dep. There was a substantially lower sales effectiveness for vehicles purchased at the Manheim Palm Beach auto auction than for vehicles purchased at auctions elsewhere. Ex 42, Ex.3 to NAAS Dep. D-00252888.

99. When the parts inventory scheme was uncovered, E.W. Napleton directed Khaytin and Revuelta to disclose such schemes to him so he could protect them. Ex. 7, Eddleman Dep. 22:18-23:23, 49:5-20, 158:4-160:8, 171:9-179:4.

100. Mr. Eddleman was the general manager of a different dealership, Napleton's North Palm. *Id.* 14:25-15:4, 58:17-21.

101. E.W. Napleton urged Eddleman to engage in the scheme. *Id.* 17:11-18:4,142:6-10.

102. Khaytin was the general manager of Dealer. Ex. 45, Khaytin Dep. 28:17-19, 36:6-12; Ex. 46, Revuelta Dep. 41:1-4.

103. Khaytin's compensation was a percentage of Dealer's overall monthly profitability, including money made by the service department through HMA's payments for warranty and recall claims. Ex. 45, Khaytin Dep. 93:8-94:21. His compensation was also tied to the profitability of the parts department. *Id.* at 116:3-17; Ex. 7, Eddleman Dep.150:7-154:1.

104. Khaytin acquired vehicles from auction that were used in association with Dealer's fraudulent warranty claims. Ex. 45, Khaytin Dep. 76:14-81:8; 97:6-97:23; Ex. 48, Ex. 8 to Dealer Dep. D00255284.

105. Due to the volume of such vehicles and the time they remained at the dealership, Khaytin routinely requested exceptions to HMA's used car inventory policy from E.W. Napleton . Ex. 45, Khaytin Dep. 97:24-100:13; Ex. 7, Eddleman Dep. 13:22-14:20 and 181:17-183:19.

106. Revuelta is the service manager for the dealership. Ex. 46, Revuelta Dep. 22:15-23:19. He has management responsibility for the dealership's service department and its personnel, including Defendants Pelayo and Ruiz, and its parts department. *Id.* 41:5-7.

107. Revuelta's compensation is based, in part, on the monthly profitability of the dealership's service department and on profit from the parts inventory. *Id.* at 158:18-159:23; Ex.

13

7, Eddleman Dep. 150:11-154:1. In this manner, he profited from Defendants' scheme. Ex. 9, Diaz Dep. 31:17-32:6.

108. HMA requires dealers to submit an "Engine Diagnostic Work Sheet" signed by the service manager with each warranty claim, summarizing why engine replacement is required. Ex. 46, Revuelta Dep. 55:16-59:2; Ex. 47, Plaintiff.HMA.Napleton.00000265.

109. Revuelta signed these documents as to engines that Dealer intentionally blew or did not actually perform repairs. Ex. 46, Revuelta Dep. 55:16-59:2.

110. Revuelta also funneled vehicles to the members of his service department to blow the engines or effectuate the documentation necessary for claim approval. Exs. 49 and 50, Exs. 21 and 22 to E.W. Napleton Dep; Ex. 51, Ex. 11D to Dealer Dep. 00284398.

111. Pelayo is a Service Advisor, or "service writer" at Dealer. Ex. 35, Pelayo Dep. 9:4-12. He completed the repair orders associated with engine claims. *Id.* 12:3-7, 13:18-5.

112. Pelayo's compensation is based on the gross amount of all of the repair orders he completes. *Id.* 15:16-16:4. In this manner, he profited from Defendants' scheme. Ex. 9, Diaz Dep. 31:17-32:4.

113. Service Advisors have discretion over the Service Technician that will perform the work associated with any given repair order or claim. Ex. 35, Pelayo Dep. 14:8-15:15; Ex. 9, Diaz Dep. 14:8-17:11.

114. Pelayo included false information in the repair orders associated with fraudulent claims and directed vehicles to Service Technicians that were a part of the scheme. Ex. 35, Pelayo Dep. 12:3-7, 14:8-15:15; Ex. 9, Diaz Dep. 13:18-5, 14:8-17:11; Exs. 52, 53, 54, 55, and 56, Exs. 9A, 9B, 10A, 10B, and 11B to Dealer Tr. (May 20, 2021).

115. Pelayo was the Service Advisor on 39 of the claims involving duplicate photographs and/or different photographs of the same oil pan. Comp. Ex. 57, Repair Orders.

116. Ruiz is a Service Technician at the dealership. Ex. 34, Ruiz Dep. 7:25-8:24; Ex. 35, Pelayo Dep. 14:13-20. He performs engine diagnoses and replacements. This includes taking photographs of oil pans, as described above. Ex. 34, Ruiz Dep. 18:11-13.

117. Ruiz fills out the Engine Diagnosis Worksheets that are signed by Revuelta. *Id.* 18:4-25:9; Ex. 46, Revuelta Tr. 55:16-58:4, 97:6-14.

118. Ruiz is paid a flat rate for each of the repairs he performs. Ex. 34, Ruiz Tr. 27:3-28:4. In this manner, he profited from Defendants' scheme. Ex. 9, Diaz Tr. 31:17-32:2.

14

119. Ruiz took and/or provided photographs of oil pans from vehicles other than the ones that were the subject of the engine claims in connection with false warranty claims. Ex. 9, Diaz Dep. 32:13-33:1, 35:14-36:8, 84:4-85:14; ECF 316-1, *see also* ECF 316-1, Smith Report at 26-35 and Appendices C-F; Ex. 58, Composite of Ruiz Repair Orders.

120. Ruiz was the Service Technician on 24 of the claims involving duplicate photographs or different photographs of the same oil pan. Ex. 58, Ruiz Repair Orders.

121. Ruiz kept an oil pan that contained metal shavings so that it could be photographed in connection with multiple engine claims for different vehicles, which he provided for use by other technicians. *Id.*; Ex. 9, Diaz Dep. 32:13-33:11, 35:14-36:8, 84:4-85:14; ECF 316-1, Smith Report at 26-35 and Appendices C-F.

122. Ruiz also actually blew engines, as was observed by Mr. Diaz. Ex. 9, Diaz Dep. 28:3-31:12; 137:9-15.

123. Ruiz also put false information into the Engine Diagnostic Worksheets. Ruiz Dep. 23:15-25:19.; Comp. Ex. 58, Ruiz ROs; Ex. 35, Pelayo Tr. 46:12-51:2. Exs. 52-55, Exs. 9A, 9B, 10A, 10B to Dealer Dep.; Ex. 59, Ex. 7 to Lang Dep. WPBHyundaiWF0115511.

124. Dealer employs Khaytin, Revuelta, Pelayo, and Ruiz. Ex. 34, Ruiz Dep. 7:25-8:12; Ex. 46, Revuelta Dep. 22:15-23:19; Ex. 35, Pelayo Dep. 9:4-12.

125. Dealer was paid by HMA for the engines it replaced in connection with recalls, including the fraudulent warranty claims. Ex. 33, NAAS Dep. 178:9-180:6.

126. The rate of engine replacements and engine replacements involving purported engine seizures were both routinely and substantially higher at Dealer than at other dealerships. ECF 316-1, ECF 316-1, Jim Smith June 27, 2022 Report at 45-52.

D. **HMA's Allocation System**

127. HMA uses an industry-standard allocation method to distribute its vehicles that includes an "earned" formulaic and a discretionary component. Ex. 19, Stockton Dep. 95:17-96:6.

128. For the vast majority of vehicles, HMA allocates anywhere between 90% to 85% of its inventory using a "nondiscretionary" computerized formula that treats all of its approximately 820 Hyundai dealers across the country the same based upon a dealer's prior sales and current inventory. Ex. 16, Turbyfield Dep 112:5-11; Ex. 60, Layton Dep. 27:24-28:16.

129. HMA distributes the remaining 10% to 15% of its vehicles outside the non-discretionary computer calculated allocation process, through a discretionary pool, allowing

15

Hyundai, in its discretion, to facilitate specific needs within its market. Ex. 13, Fratianni Dep. 19:7-11,19-22; Ex. 14, Kim Dep. 26:22-27:1; 27:16-21; Ex. 16, Turbyfield Dep. 15:4-16:2.

130. Most manufacturers have programs authorizing discretionary allocations, which are standard in the industry. Ex. 19, Stockton Dep. 56:15-21, 57:4-25, 83:13-84:2, 84:21-85:17.

131. The vast majority of HMA's discretionary pool is used for reasons including: stocking new dealerships that have just opened with initial inventory; adding vehicles when an existing dealership is the subject of a buy-sell to help with the transition; replacing vehicles that were damaged in transit on the way to a dealership; and fulfilling sold orders. Ex. 61, Declaration of Trisha Quezada ¶¶ 5–7(a-f); Ex. 14, Kim Dep. 28:12-29:1; Ex. 16, Turbyfield Dep.14:12-15:3; Ex. 19, Stockton Dep. 87:11-21; 96:8-17; 98:4-13; 99:23-100:3; 100:9-17.

132. Allocation of the remaining vehicles in the discretionary pool are left to the good business judgment of HMA's regional management, to reward dealers who are good business partners and invest in the Hyundai brand. Ex. 14, Kim Dep. 31:7-10, 36:7-11, 45:13-21; Ex. 16, Turbyfield Dep.16:24-18:5

133. Being a good business partner includes a dealer's participation in HMA sponsored programs intended to increase a dealer's new vehicle sales and awareness of the Hyundai brand in the market. Ex. 14, Kim Dep. 28:12-29:1; 31:11-22; Ex. 16, Turbyfield Dep. 17:20-18:16.

134. One of HMA's most important programs is called the Hyundai Dealer Advertising Association ("HDAA") in which dealers in a particular market are asked to form an advertising association. Ex. 13, Fratianni Dep. 38:23-39:2; Ex. 14, Kim Dep. 69:17-24.

135. Dealers that become part of the HDAA pool money, with a matching contribution by HMA, to run local market ads and raise awareness of the Hyundai brand. Ex. 14, Kim Dep. 69:17-24; Ex. 16, Ex. 20, Dealer 30(b)(6) Dep. (Oct 4, 2022) 96:22-97:4.

136. Dealer asserts it has not received extra discretionary vehicles from July 2020-March 2022. Ex. 20, Dealer Dep. (Oct 4, 2022) 96:6-10; 108:6-17.

137. The COVID-19 Pandemic resulted in a scarcity of available vehicles. *Id.* 108:6-11; Ex. 14, Kim Dep. 56:1-6; 61:4-16; 100:1-5; Ex. 24, Goetze Dep. 84:17-23.

138. Many dealers have complained about their inventory during the Pandemic. Ex. 13, Fratianni Dep. 25:6-24; Ex. 24, Goetze Tr. 84:17-23; Ex. 20, Dealer Dep. (Oct. 4) 109:14-21.

16

139. The Hyundai Dealer Sales and Service Agreement recognizes that certain when Hyundai Products may be in short supply, HMA will allocate vehicles in a fair and equitable manner as it may determine in its sole discretion. Ex. 62, Standard Provisions Section 10.A.1.

140. HMA made the discretionary decision with the limited vehicles available in the discretionary pool that it would not allocate vehicles to dealers that were not participating in its HDAA program and were also in litigation with HMA. Ex. 14, Kim Dep. 28:12-29:1; Ex. 16, Turbyfield Dep. 16:24-17:17.

141. HMA met several times with Dealer to explain the importance of the HDAA program, but Dealer refused to participate. Ex. 20, Dealer Dep. (Oct. 4, 2022) 97:2-99:3.

142. Dealer knew HMA viewed participation in an HDAA and as important. *Id.*

143. Dealer refused to join an HDAA. *Id*. 99:13-100:13.

144. Napleton's expert acknowledges that allocation systems may reward dealer that invest in the brand. Ex. 63, Stockton Report ¶ 31, p. 15. HMA's expert has explained how HMA's discretionary allocation serves economic efficiency and aligns incentives between manufacturer and dealers. Ex. 64, Asker Report at 35 § 5.3.

145. To the extent a dealer has less inventory, the formulaic allocation system allocates additional vehicles to true up inventory among all dealers. *Id.* § 5.1.2; Ex. 65, Ex. 8 to Asker Report.

146. During the relevant time period Dealer turned down hundreds of vehicles that HMA offered the dealership through its regular formulaic allocation. Ex. 21, Tab 21.

147. Dealer's inventory has been fuller than other Hyundai dealers since the alleged discrimination began. Ex. 64, Asker Report at 38 § 6.1.1.

17

October 27, 2022

           Respectfully submitted,

           **BILZIN SUMBERG BAENA PRICE & AXELROD LLP**
           1450 Brickell Avenue, Suite 2300
           Miami, Florida 33131
           Telephone: 305-374-7580
           Facsimile: 305-374-7593

           By: */s/ Mitchell E. Widom*
           Mitchell E. Widom, FBN 473911
           mwidom@bilzin.com
           Raquel M. Fernandez, FBN 55069
           rfernandez@bilzin.com
           Shalia Sakona, FBN 107398
           ssakona@bilzin.com
           etrujillo@bilzin.com
           eservice@bilzin.comRespectfully submitted

           Loren W. Fender, Esq.
           Fla Bar No. 553921
           loren.fender@bowmanandbrooke.com
           **Bowman and Brooke LLP**
           Two Alhambra Plaza, Suite 800
           Miami, FL 33134-5214
           Tel: (305) 995-5600
           Fax: (305) 995-6100

           Joel H. Smith (*pro hac vice*)
           joel.smith@bowmanandbrooke.com
           Kevin J. Malloy, Esq. (*pro hac vice*)
           kevin.malloy@bowmanandbrooke.com
           **Bowman and Brooke LLP**
           1441 Main Street, Suite 1200
           Columbia, SC 29201-2897
           Tel. (803) 726-7420
           Fax: (803) 726-7421
           megan.bradley@nelsonmullins.com
           James Andrew Bertron, Jr.
           Fla Bar No. 982849
           andy.bertron@nelsonmullins.com
           Ginger Barry Boyd
           Fla Bar No. 294550

> ginger.boyd@nelsonmullins.com
> Megan K. Bradley
> Florida Bar No. 1011763
>
> **Nelson Mullins Riley & Scarborough LLP**
> 215 S. Monroe Street, Suite 400
> Tallahassee, FL 32301
> Tel. (850) 681-6810
> Fax. (850) 681-9792
>
> Christopher C. Genovese (*pro hac vice*)
> chris.genovese@nelsonmullins.com
> **Nelson Mullins Riley & Scarborough LLP**
> 1320 Main Street, 17th Floor
> Columbia, SC 29201
> Tel. (803) 799-2000
> Fax. (803) 256-7500
>
> *Counsel for Hyundai Motor America Corporation and Hyundai Motor Company*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on October 27, 2022, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

> By: */s/ Mitchell E. Widom*
>       Mitchell E. Widom